**NO. 25-11062**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiff - Appellee*,

v.

ALAN SPENCER THOMPSON,
*Defendant - Appellant*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
FORT WORTH DIVISION

---

# APPELLANT'S INITIAL BRIEF

---

JASON D. HAWKINS
*Federal Public Defender*
Northern District of Texas

TAYLOR WILLS EDWARDS "T.W." BROWN
*Assistant Federal Public Defender*
Northern District of Texas
P.O. Box 17743
819 Taylor Street, Room 9A10
Fort Worth, TX 76102
(817) 978-2753
Taylor_W_Brown@fd.org
Texas Bar No. 24087225

Attorneys for Appellant

## CERTIFICATE OF INTERESTED PERSONS

(1) Number and style of the case below: *United States of America v. Alan Spencer Thompson*, Case No. 4:25-CR-043-P (01).

(2) The following people have an interest in this case.

| | |
|---|---|
| **DISTRICT COURT:** | The Honorable Mark Pittman |
| **UNITED STATES MAGISTRATES:** | The Honorable Hal R. Ray, Jr.<br>The Honorable Jeffrey L. Cureton |
| **APPELLANT:** | Alan Spencer Thompson |
| **FEDERAL PUBLIC DEFENDER:** | Jason D. Hawkins |
| **ASS'T FEDERAL PUB. DEFENDERS**: | Eduardo Carranza<br>Taylor Wills Edwards "T.W." Brown |
| **UNITED STATES ATTORNEYS:** | Chad Meacham<br>Nancy Larson<br>Ryan Raybould |
| **ASS'T U.S. ATTORNEYS**: | Frank L. Gatto<br>Michael Levi Thomas<br>Gail Hayworth |

/s/ Taylor Wills Edwards "T.W." Brown
**TAYLOR WILLS EDWARDS "T.W." BROWN**
ATTORNEY OF RECORD FOR THE APPELLANT

## Request for Oral Argument

The complexity and novelty of the sole issue advanced on appeal warrants oral argument in this case. Here it is. Can a defendant with felony DWI convictions based solely on the fact of repetition, rather than some other aggravating fact, be prosecuted under 18 U.S.C. § 922(g)(1) consistent with the Second Amendment? Mr. Thompson preserved this issue below, and the district court rejected his as-applied challenge based in part on a purported "tradition . . . of severely punishing repeat offenders." (ROA.74). Despite referencing a trio of laws to prove the point, the district court never even attempted to analogize the actual conduct underlying Mr. Thompson's disqualifying convictions to the conduct targeted by the historical laws proffered by the government and accepted below. *See* (ROA.74). Relying on a case from the Sixth Circuit Court of Appeals, the district court also suggested that Mr. Thompson's "prior convictions for the same dangerous conduct . . . evince a likelihood of future dangerous conduct." (ROA.74) (quoting *United States v. Goins*, 118 F.4th 794, 804 (6th Cir. 2024)). At sentencing, the district court then undercut this analysis by characterizing Mr. Thompson's disqualifying convictions as non-violent, (ROA.204), and even the government conceded that Mr. Thompson's record —"simply DWIs"—did not present a single "violent" offense., *see* (ROA.206). Argument is appropriate. *See* FED. R. APP. P. 34(a)(2)(B)-(C).

## TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS ........ ii

REQUEST FOR ORAL ARGUMENT ........ iii

TABLE OF AUTHORITIES ........ v

JURISDICTIONAL STATEMENT ........ 1

ISSUES PRESENTED FOR APPEAL ........ 2

STATEMENT OF THE CASE ........ 2

I. The district court rejected Mr. Thompson's motion to dismiss a one-count indictment alleging a violation of 18 U.S.C. § 922(g)(1), and after he pleaded guilty, ordered him to serve a five-year sentence ........ 2

a. Due to their repetition, Mr. Thompson's third, fourth, and fifth DWI convictions were punishable by more than one year in prison ........ 2

b. The government charged Mr. Thompson with violating § 922(g)(1), and citing the Second Amendment, he moved to dismiss the indictment ...... 4

c. The district court rejected Mr. Thompson's as-applied challenge to § 922(g)(1), and after he pleaded guilty to the one-count indictment, imposed a 60-month term of imprisonment ........ 8

SUMMARY OF THE ARGUMENT ........ 11

ARGUMENT ........ 12

I. Mr. Thompson's prosecution violates the Second Amendment ........ 12

a. Standard **of review:** the *de novo* standard applies ........ 12

b. The district court should have dismissed the one-count indictment.....13

i. Section 922(g)(1) is a presumptively unconstitutional infringement on Mr. Thompson's right to keep and bear arms..13

ii. There is no historical tradition of disarming someone with a criminal history analogous to Mr. Thompson's............................15

iii. Mr. Thompson is not, by virtue of his disqualifying convictions for felony DWI, a threat to public safety and the orderly functioning of society.....................................................................23

c. The district court correctly cabined its analysis to Mr. Thompson's disqualifying convictions under § 922(g)(1), and any argument to the contrary is foreclosed.........................................................................28

CONCLUSION.........................................................................................................29

CERTIFICATE OF FILING AND SERVICE...................................................................30

CERTIFICATE OF COMPLIANCE .............................................................................31

## TABLE OF AUTHORITIES

### FEDERAL STATUTES

18 U.S.C. § 922.........................................................................................1, 5, 13

18 U.S.C. § 924...................................................................................................1

18 U.S.C. § 3231.................................................................................................1

28 U.S.C. § 1291.................................................................................................1

## STATE STATUTES

TEX. PENAL CODE § 12.21 ........ 3

TEX. PENAL CODE § 12.22 ........ 3

TEX. PENAL CODE § 49.04 ........ 3, 7

TEX. PENAL CODE § 49.09 ........ 3, 7

## FEDERAL RULES

FED. R. APP. P. 4 ........ 1

FED. R. APP. P. 34 ........ iii

## FEDERAL CASES

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ........ 8, 28

*Class v. United States*, 583 U.S. 174 (2018) ........ 12

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ........ 8, 11, 13-14, 27-28

*Tennessee v. Garner*, 471 U.S. 1 (1985) ........ 16

*United States v. Betancourt*, 139 F.4th 480 (5th Cir. 2025) ........ 25

*United States v. Bullock*, 123 F.4th 183 (5th Cir. 2024) ........ 14

*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024) ........ 14, 22

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) ........ 6, 8, 13-15, 20-21, 29

*United States v. Giglio*, 126 F.4th 1039 (5th Cir. 2025) ........ 12

*United States v. Goins*, 118 F.4th 794 (6th Cir. 2024) ........ iii, 9, 24, 27

*United States v. Howard*, 766 F.3d 414 (5th Cir. 2014) ........ 13

*United States v. Mitchell*, 160 F.4th 169 (5th Cir. 2025) ........ 14, 21, 27-28

*United States v. Morgan*, 147 F.4th 522 (5th Cir. 2025) ........ 27

*United States v. Penn*, 969 F.3d 450 (5th Cir. 2020) ........ 12

*United States v. Quiroz*, 125 F.4th 713 (5th Cir. 2025) ........ 20, 22

*United States v. Schnur*, 132 F.4th 863 (5th Cir. 2025) ........ 6-7, 11, 13-14, 24, 26-27

*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024) ........ 27

## JURISDICTIONAL STATEMENT

Mr. Thompson's appeal is appropriately before the Court. A grand jury in the Northern District of Texas charged him with committing an offense defined in Title 18 of the United States Code. (ROA.22) (citing 18 U.S.C. §§ 922(g)(1), 924(a)(8)). The United States District Court for the Northern District of Texas appropriately exercised jurisdiction on that basis. *See* 18 U.S.C. § 3231. The district court entered a final judgment on September 15, 2025. (ROA.7, 99-103). Mr. Thompson filed a timely notice of appeal the following day. *See* (ROA.7, 104); *see also* FED. R. APP. P. 4(b)(2). This Court may exercise jurisdiction over any appeal from a final judgment. *See* 18 U.S.C. § 1291. Mr. Thompson challenges his conviction as unconstitutional and the resulting sentence as "imposed in violation of law." *See* 18 U.S.C. § 3742(a)(1).

## ISSUES PRESENTED FOR APPEAL

Mr. Thompson's appeal presents a preserved issue of first impression. Can a defendant with felony DWI convictions based solely on the fact of repetition, rather than some other aggravating fact, be prosecuted under 18 U.S.C. § 922(g)(1) consistent with the Second Amendment?

## STATEMENT OF THE CASE

### I. The district court rejected Mr. Thompson's motion to dismiss a one-count indictment alleging a violation of 18 U.S.C. § 922(g)(1), and after he pleaded guilty, ordered him to serve a five-year sentence.

#### a. Due to their repetition, Mr. Thompson's third, fourth, and fifth DWI convictions were punishable by more than one year in prison.

Mr. Thompson has been convicted for committing DWI in the State of Texas on five separate occasions. He received a 20-day term of imprisonment after pleading guilty to the first DWI offense in Tarrant County on May 7, 2008. Presentence Investigation Report at 10 (¶ 41), *United States v. Alan Thompson*, No. 4:25-CR-043-P (N.D. Tex. July 22, 2025), ECF No. 43. He received a 60-day sentence the next year after pleading guilty to a second DWI in Tarrant County. *Id.* (¶ 41). He received his third and fourth convictions the year after that. *Id.* at 10-11 (¶¶ 42-43). The earlier offense occurred on March 13, 2010. *Id.* at 10 (¶ 42). The later offense took place on August 7. *Id.* at 11 (¶ 43). These prosecutions were

assigned to the same district court in Tarrant County, and Mr. Thompson pleaded guilty to both on September 30, 2010. *Id.* at 10-11 (¶¶ 42-43). He received a pair of three-year terms of imprisonment. *Id.* Last, Mr. Thompson received a two-year term of imprisonment after a fifth DWI in Parker County on April 4, 2018. *Id.* at 11 (¶ 44).

Due to their repetition, Mr. Thompson's third, fourth, and fifth DWI convictions were punishable by more than one year in prison. His first DWI was classified by the Texas Penal Code as a Class B misdemeanor. TEX. PENAL CODE § 49.04(b) (Vernon 2003). The statutory maximum term of imprisonment for Class B misdemeanors is only 180 days. TEX. PENAL CODE § 12.22(2) (Vernon 2003). Due to the earlier conviction, Mr. Thompson's second DWI became a Class A misdemeanor. *See* TEX. PENAL CODE § 49.09(a) (Vernon Supp. 2007). The Texas Penal Code sets the maximum term of imprisonment for Class A misdemeanors at "one year." TEX. PENAL CODE § 12.21(2) (Vernon Supp. 2007). Because he had two prior convictions before committing his third and fourth DWIs, both were treated as third-degree felonies. TEX. PENAL CODE § 49.09(b)(2) (West Supp. 2010). So too the fifth. TEX. PENAL CODE § 49.09(b)(2) (West 2016). The Texas Penal Code sets the punishment range for third-degree felonies at a minimum two-year term of

imprisonment and the maximum at ten years. TEX. PENAL CODE § 12.34 (2) (Vernon Supp. 2008).

**b. The government charged Mr. Thompson with violating § 922(g)(1), and in response, he advanced an as-applied challenge under the Second Amendment.**

On October 24, 2024, the Parker County Sheriff's Office received a troubling call from Mr. Thompson. (ROA.11). He reported hearing voices "telling him to commit a school shooting" and told officers that he possessed firearms at his home. (ROA.11). The voices, Mr. Thompson reported, "were coming from hearing aids placed in his ear by another individual and without his knowledge." (ROA.11). Officers responded to Mr. Thompson's home, and he gave them consent to "seize" the firearms "for safekeeping." (ROA.11). The officers seized a series of assembled firearms, receivers, ammunition, and magazines. (ROA.11-12). They then took Mr. Thompson into emergency custody based on concerns about his mental health. (ROA.12). Mr. Thompson remained in emergency custody for twelve days. (ROA.12).

In the weeks leading up to the call, Mr. Thompson had engaged in some strange behavior. He received a criminal-trespass warning about a month before the call after being repeatedly asked to leave the parking lot of a church in Azle, Texas, with a school on the same campus. (ROA.13-14). When a police officer asked why

he was there in the first place, Mr. Thompson told the officer he would not believe the answer, and when asked whether God told him to visit the church, Mr. Thompson said, "Yeah, something like that." (ROA.13-14). On October 8, Mr. Thompson visited the sheriff's office and asked to make a report about voices in his headphones telling him "to go to the bank and open accounts." (ROA.14). On October 21, Mr. Thompson called the sheriff's office again to complain about hearing voices through a hearing aid, but when officers responded to the call, they found no hearing aids in Mr. Thompson's ears. (ROA.14). Mr. Thompson told the responding officers that the voices were "telling him to remove money from a trust fund" and "to damage his neighbor's 18-wheeler truck by shooting out the tires." (ROA.14). Mr. Thompson indicated that he did not have access to a trust fund and knew that he should not damage another's property. (ROA.14).

A grand jury in the Northern District of Texas ultimately charged Mr. Thompson with unlawfully possessing one of the firearms recovered from his home on October 24. (ROA.22). The one-count indictment cited 18 U.S.C. § 922(g)(1) as the charged offense, and the allegations tracked the statute's language. *Compare* (ROA.22), *with* 18 U.S.C. § 922(g)(1). Mr. Thompson, the indictment alleged, "had been convicted of a crime punishable by imprisonment for a term in excess of one year" and knew about this disqualifying fact before possessing the charged gun.

(ROA.22). The indictment did not specify a prior conviction punishable by more than one year but did allege as the charged firearm a single pistol recovered from Mr. Thompson's home on October 24. *See* (ROA.11-12, 22).

Raising an as-applied challenge under the Second Amendment, Mr. Thompson filed a motion to dismiss. "There is no well-established historical tradition of 'disarming someone with' an analogous 'criminal history'" to his own, Mr. Thompson argued. (ROA.44) (quoting *United States v. Schnur*, 132 F.4th 863, 867 (5th Cir. 2025)). "The government," he conceded, "might establish the case-specific constitutionality of § 922(g)(1) by drawing a convincing analogy between [his] disqualifying convictions . . . and some Founding Era crime punishable by death or forfeiture of estate." (ROA.45) (citing *United States v. Diaz*, 116 F.4th 458, 468-69 (5th Cir. 2024)). "The government," Mr. Thompson continued, "may likewise defeat [his] challenge if the disqualifying conviction[s] under § 922(g)(1)" could establish Mr. Thompson "as 'a threat to public safety and the orderly functioning of society.'" (ROA.45) (quoting *Schnur*, 132 F.4th at 869).

From there, Mr. Thompson argued that the government could make neither showing. On the death-equals-disarmament analysis, he began with an obvious point. "Since cars postdate the Founding Era by almost 100 years, there is no relevant tradition of disarming contemporary defendants based on similar crimes."

(ROA.46) (citing *Schnur*, 132 F.4th at 867). Mr. Thompson then proffered but rejected as alternate analogues a series of laws aimed at temporarily disarming intoxicated individuals or those committing other alcohol-related crimes. *See* (ROA.47-49). On the disarm-the-dangerous analysis, Mr. Thompson pointed out the elements of his disqualifying convictions for DWI. (ROA.49). The offense required nothing more than the operation of a "'motor vehicle in a public place' while 'intoxicated.'" (ROA.49) (quoting TEX. PENAL CODE § 49.04(a) (West Supp. 2010)). Mr. Thompson received an enhanced penalty due to his prior convictions, "but no element of the offense—the act itself or the recidivism enhancement—implicates real-world violence." (ROA.49-50) (citing TEX. PENAL CODE § 49.09(b)(2) (West 2016); TEX. PENAL CODE § 49.09(b)(2) (West Supp. 2010)). As a result, Mr. Thompson concluded, he did not represent "a clear threat of physical violence to others" based on his disqualifying convictions. (ROA.49) (citing *Schnur*, 132 F.4th at 868).

Mr. Thompson also addressed the scope of the relevant analysis. In short, the district court could "not look beyond [his] disqualifying convictions" under § 922(g)(1). (ROA.50). Since "[a] statute's constitutionality depends upon what 'it actually authorizes or prohibits,'" Mr. Thompson urged the district court to confine its work "to only those prior convictions that" fell within § 922(g)(1)'s "disqualifying

criteria." (ROA.50-51) (citing *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015); *Diaz*, 116 F.4th at 467). That approach, he explained, tracked this Court's binding precedent, (ROA.51) (citing *United States v. Contreras*, 125 F.4th 725, 730 (5th Cir. 2025)), and Mr. Thompson urged the district court to "reject any attempt by the government to defeat [his] motion based on broader concerns about his background or record," (ROA.51).

The government made two arguments in response. First, citing a trio of Eighteenth Century laws, it attempted to prove up "a historical tradition of severely punishing repeat offenders." (ROA.67) (citations omitted). Mr. Thompson's record, the government continued, "reveals a dangerous pattern of misusing alcohol and operating motor vehicles." (ROA.68). Those actions "pose a danger to public safety," and his prosecution under § 922(g)(1) thus fell within a distinct "historical tradition" aimed at disarming those exhibiting a "pattern of dangerous conduct." (ROA.69) (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022)).

#### c. The district court rejected Mr. Thompson's as-applied challenge and ultimately imposed a 60-month term of imprisonment.

The district court sided with the government on the motion to dismiss and denied Mr. Thompson's as-applied challenge in a brief order. (ROA.73-74). The trio of laws cited by the government, the district court indicated, "established" a

"tradition and history of severely punishing repeat offenders." (ROA.74) (citations omitted). For additional support, the district court cited an opinion from the Sixth Circuit Court of Appeals rejecting an as-applied challenge brought by a defendant with "convictions for DUI and driving on a suspended license." (ROA.74). "[P]rior convictions for the same dangerous conduct," the Sixth Circuit concluded, "evince a likelihood of future dangerous conduct." (ROA.74) (citing *United States v. Goins*, 118 F.4th 794, 804 (6th Cir. 2024)). On this analysis, the district court found "that the Second Amendment does not preclude" Mr. Thompson's prosecution under § 922(g)(1). (ROA.74).

Mr. Thompson later pleaded guilty, and in advance of sentencing, requested a 60-month term of imprisonment. As for the guilty plea, he submitted a factual resume establishing his guilt to the offense alleged in the one-count indictment, (ROA.78), but did not enter into a plea agreement with the government, *see* Presentence Investigation Report, *supra*, at 3 (¶ 7). The presentence report, in turn, recommended a term of imprisonment somewhere between 84 and 105 months. *Id.* at 3 (¶ 82). Through counsel, Mr. Thompson filed a sentencing memorandum highlighting a series of mitigating facts in support of his request for a five-year sentence instead. Sentencing Memorandum and Downward Variance at 1-5, *United States v. Alan Thompson*, No. 4:25-CR-043-P (N.D. Tex. Aug. 20, 2025), ECF No. 46.

The memorandum also pointed out Mr. Thompson's "courageous decision to call 911" upon hearing voices telling him to commit violent acts. *Id.* at 5. That "level of self-disclosure is rare and significant." *Id.* "His decision to self-report, combined with the absence of any intent to harm and the context of severe mental distress, presents a sentencing posture rooted in accountability, not avoidance." *Id.* at 6.

The district court imposed the 60-month sentence requested by Mr. Thompson, and along the way, assessed the relative severity of his criminal record. "[I]f you look at his criminal history," the district court noted, "we don't really have a history of violent criminal history, or at least violence in the sense that someone is getting beat up or using a gun." (ROA.204). "[A]s bad as a DWI is," the district court continued, "it's not quite as bad as assault, or kidnapping, or that sort of thing." (ROA.204). Through counsel, Mr. Thompson agreed. "And like Your Honor said, he's not – there's no violent history as far as him." (ROA.205). The government did not "oppose a downward variance" and conceded that Mr. Thompson's criminal history—"simply DWIs"—did not present a single "violent" offense. (ROA.206). The district court ultimately imposed the 60-month sentence requested by Mr. Thompson, and to support that decision, characterized the criminal-history category identified in the PSR—category IV—as "overrepresented." (ROA.213).

## SUMMARY OF THE ARGUMENT

The district court's Second Amendment analysis cannot survive this Court's *de novo* review. Section 922(g)(1) prospectively and permanently disarms Mr. Thompson based on a series of disqualifying convictions for felony DWI, but there is no well-established historical tradition of "disarming someone with" an analogous "criminal history." *See United States v. Schnur*, 132 F.4th 863, 867 (5th Cir. 2025) (citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022)). The district court avoided this conclusion below based in part on a purported "tradition . . . of severely punishing repeat offenders," but despite referencing a trio of laws to prove the point, never attempted to analogize the actual conduct underlying Mr. Thompson's disqualifying convictions to the conduct targeted by the historical laws proffered by the government and adopted by the district court to reject Mr. Thompson's as-applied challenge. *See* (ROA.74). A close look at these laws reveals there to be no analogy at all between the various types of conduct covered, and by overlooking this point, the district court erred. As for dangerousness, Mr. Thompson is not, by virtue of his disqualifying convictions for DWI, a threat to public safety and the orderly functioning of society. The district court suggested otherwise by citing an out-of-circuit opinion from the Sixth Circuit, but that court applies a distinct test, and even on its own terms, Mr. Thompson's case is distinguishable on the facts. Were that not

enough, the district court undercut any arguments about the dangerousness posed by Mr. Thompson's disqualifying convictions by identifying them as non-violent at sentencing and then comparing them to traditionally violent offenses like assault and kidnapping. (ROA.204). One way or another, the district court erred by rejecting Mr. Thompson's as-applied challenge to § 922(g)(1), and this Court should reject as foreclosed any attempt by the government on appeal to widen the aperture beyond his disqualifying convictions.

## ARGUMENT

### I. Mr. Thompson's prosecution violates the Second Amendment.

#### a. Standard of review: the *de novo* standard applies.

Mr. Thompson preserved an as-applied challenge to § 922(g)(1) by raising the claim in a detailed motion to dismiss, *see* (ROA.44-51), and securing a ruling on the claim in an order from the district court, *see* (ROA.73-74). "By raising this challenge in his motion to dismiss," Mr. Thompson "preserved his right to pursue it again here." *United States v. Giglio*, 126 F.4th 1039, 1042 (5th Cir. 2025) (citing *Class v. United States*, 583 U.S. 174, 178-82 (2018); *United States v. Penn*, 969 F.3d 450, 459 (5th Cir. 2020)). This Court "review[s] preserved challenges to the constitutionality of a criminal statute *de novo*." *Id.* (quoting *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014)).

### b. The district court should have dismissed the one-count indictment.

#### i. Section 922(g)(1) is a presumptively unconstitutional infringement on Mr. Thompson's right to keep and bear arms.

Section 922(g)(1)'s prohibition on Mr. Thompson's mere possession of a firearm clashes with the plain text of the Second Amendment. "[T]he right of the people to keep and bear Arms," the Second Amendment states, "shall not be infringed." U.S. CONST., amend. II. Section 922(g)(1) makes it a crime for anyone "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Mr. Thompson, despite his criminal record, "is unequivocally among 'the people' protected by the Second Amendment." *United States v. Schnur*, 132 F.4th 863, 867 (5th Cir. 2025) (citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022)). In turn, "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Diaz*, 116 F.4th at 467 (citing *United States v. Rahimi*, 602 U.S. 680, 708 (2024) (Gorsuch, J., concurring)). "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.

This presents a problem for the government. To overcome § 922(g)(1)'s presumptive unconstitutionality, it "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Under this Court's binding precedent, the government might establish the case-specific constitutionality of § 922(g)(1) by drawing a convincing analogy between Mr. Thompson's disqualifying convictions and some Founding Era crime punishable by death or forfeiture of estate. *Diaz*, 116 F.4th at 468-69. The government may likewise defeat a challenge if those disqualifying convictions establish Mr. Thompson to be "a threat to public safety and the orderly functioning of society." *Schnur*, 132 F.4th at 869 (citing *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024)).

The government can make neither showing in this case, and the district court's contrary decisions cannot withstand this Court's *de novo* review. For one thing, the "analogical reasoning" underlying the district court's recidivism-is-recidivism approach stretches "far beyond" the reach permitted by this Court's precedents and those of the Supreme Court. *See United States v. Mitchell*, 160 F.4th 169, 190 (5th Cir. 2025) (quoting *United States v. Connelly*, 117 F.4th 269, 282 (5th Cir. 2024)). For another, Mr. Thompson's convictions for DWI fell within § 922(g)(1)'s criteria based on their mere repetition, not any aggravating facts about his commission of the offense, and the elements of the underlying offense required only his operation of a

motor vehicle while intoxicated, not real-world violence directed at others. He is not, by virtue of his disqualifying convictions for DWI, a threat to public safety and the orderly functioning of society. He accordingly may not be disarmed on that basis. This Court should recognize the district court's as-applied error, vacate the judgment, and reverse the conviction.

#### ii. There is no historical tradition of disarming someone with a criminal history analogous to Mr. Thompson's.

The government's appeal to historical laws authorizing the death penalty for certain recidivists was an attempt to comply with *United States v. Diaz*. There, this Court initially declined the government's invitation to treat everyone with a disqualifying conviction under § 922(g)(1) as equivalent to those convicted of felony offense in the Founding Era but ultimately rejected an as-applied challenge brought by a defendant with a disqualifying conviction for "vehicle theft." *See* 116 F.4th at 467. At the outset, the government argued that the existence of harsh penalties for convicted "felons" in the Founding Era, such as "capital punishment and estate forfeiture," established § 922(g)(1)'s across-the-board constitutionality today. *Id.* at 467-68. This Court rejected that argument as unduly broad. After all, "[m]any crimes classified as misdemeanors, or nonexistent, at common law are now felonies." *Id.* at 468 (quoting *Tennessee v. Garner*, 471 U.S. 1, 14 (1985)). "The fact that" Mr.

Diaz qualified as a "felon "today, then, does not necessarily mean that he would have been one" in the Founding Era. *Id.* This Court nevertheless rejected Mr. Diaz's as-applied challenge after isolating historical laws subjecting some thieves in Colonial and Founding Era America to the death penalty. *Id*. at 468-69 (citations omitted). "[I]f capital punishment was permissible to respond to theft" at that time, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible" when applied against a defendant with a modern-day conviction for felony theft. *Id*. at 469.

The analogues identified by this Court in *Diaz* established a close fit between that defendant's disqualifying conviction under § 922(g)(1) and the analogous conduct subjected to harsh penalties in the Founding Era. One law, for example, "punish[ed] theft by ordering, among other penalties, that 'all [a defendant's] estate shalbe forfected.'" *Id*. at 468 (quoting 2 RECORDS OF THE COURT OF ASSISTANTS OF THE COLONY OF THE MASSACHUSETTS BAY 1630-1692, at 32 (John Noble ed., 1904)). Another "authoriz[ed] the death penalty for theft of chattels worth over five pounds." *Id* (citing Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664–65). In turn, this Court's "own research reveal[ed] that those convicted of horse theft—likely the closest colonial-era analogue to vehicle theft—were often subject to the death penalty." *Id*. (Kathryn Preyer, *Crime and Reform in Post-Revolutionary Virginia*, 1 Law &

Hist. Rev. 53, 73 (1983)). These laws therefore "establish[ed] that our country has a historical tradition of severely punishing people like Diaz who have been convicted of theft." *Id.* at 468-69.

After rejecting Mr. Diaz's as-applied challenge, this Court "emphasize[d] that [its] holding is not only premised on the fact that" he was "a felon." *Id.* at 469. "Simply classifying a crime as a felony does not meet the level of historical rigor required by" the Supreme Court's modern Second Amendment jurisprudence. *Id.* Section 922(g)(1) applies to anyone convicted of a crime "punishable by more than one year of imprisonment," but "not all felons today would have been considered felons at the Founding." *Id.* Congress could also adjust § 922(g)(1)'s disqualifying criteria "in the future," and "a shifting benchmark should not define the limits of the Second Amendment." *Id.* Given the narrow scope of its analysis, this Court unsurprisingly recognized that *Diaz* would not "foreclose future as-applied challenges by defendants with different predicate convictions." *Id.* at 470 n.4.

The district court's analysis below clearly runs afoul of *Diaz*. The district court, for example, cited a 1788 penal statute passed by the State of New York. (ROA.74). This law set out a laundry list of specific crimes—"treason, murder, rape, buggery[,] or burglary" just to name a few—and required every defendant convicted

for those offenses "to be hanged by the neck until he or she shall be dead."[1] From there, the law sets out a default rule for any other "felony, other than such as are herein before mentioned." *Id.* at 74. "[F]or the first offence," the second class of convicts would "be punished by fine, imprisonment, or corporal punishment." *Id.* "[F]or any second offence, or felony committed after such first conviction, every such offender shall suffer death." *Id.* The district court identified this law as supporting "an established tradition . . . of severely punishing repeat offenders," (ROA.74), but in doing so, completely ignored this Court's instruction in *Diaz* to look beyond the label. "[N]ot all felons today would have been considered felons at the Founding," and the 1788 law cited below does nothing to establish that the "predicate crimes" underlying Mr. Thompson's conviction would have been "a felony" in the Founding Era "and thus would have led to capital punishment or estate forfeiture." *See Diaz*, 116 F.4th at 469-70. On top of that, the actual "felony" offenses covered by the catch-all provision from the 1788 law remain a mystery. Without identifying the underlying conduct, rather than the fact of recidivism, this Court simply cannot determine whether Mr. Thompson's disqualifying convictions

---

[1] Thomas Greenleaf, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION AND THE ACTS OF THE LEGISLATURE SINCE THE REVOLUTION, FROM THE FIRST TO THE TWENTIETH SESSION, INCLUSIVE, at 73-74 (1792).

for DWI are analogous to any of the "felony" offense swept within the coverage of the New York law cited below.

The second law relied upon by the district court may not even exist. The district court cited a law passed by the New Hampshire Colony on June 14, 1701, which purportedly "authoriz[ed] [the] death penalty for [a] second burglary offense." (ROA.74). That does not appear to be the case. The law cited in fact sets a series of lesser penalties for sundry crimes such as "prophainely Swear[ing] . . . in the hearing of any Justice of the peace," "Drunkennesse," "ffornication with any Single woman," and "Wilfull & corrupt perjury." 1 LAWS OF NEW HAMPSHIRE 677-60 (1904). Burglary is not mentioned once, but based on the second pin-cite from its order, the district court may have intended instead to cite a law passed by the Colony in 1682. *Id.* at 790-96. That law subjected first-time burglars to branding "on the Right hand w'th the Letter B or R." *Id.* at 794. "[I]f he shall offend in the like kind a Second time he shall be putt to Death," the law continues, "or other wayes Greviously punished as the Court shall determine." *Id.* Whatever the case, the district court's conclusion does not follow from the premise. Assuming the district court intended to rely on the 1682 statute, the citation still does nothing to establish an analogical fit between a modern-day defendant with three or more convictions for DWI under the Texas Penal Code and a recidivist burglar in the New Hampshire Colony at the end

of the Seventeenth Century. Any argument to the contrary treats recidivism for one offense as equivalent to recidivism for any other, but *Diaz* requires a closer link between the conduct proscribed by the historical law cited by the government and the conduct underlying a modern-day conviction subjecting a defendant to prosecution under § 922(g)(1). *See Diaz*, 116 F.4th at 469-70.

The final law cited by the district court is likewise no good. In *United States v. Quiroz*, this Court cited "a 1748 statute" from Virginia "impos[ing] the death penalty for a third offense of stealing a hog" to help establish the wide variety of crimes subject to the death penalty in and around the Founding Era. *See* 125 F.4th 713, 720 (5th Cir. 2025) (citing LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY 42 (1993)). According to the statute at issue, "if any person whatsoever, shall be the third time convicted of hogstealing, every such offender, shall be adjudged a felon, and shall suffer death, without benefit of clergy." 6 WILLIAM WALLER HENNING, THE STATUTES AT LARGE 123 (1819). Second-time offenders were subjected to less severe penalties. *See id.* at 121-22. For that reason alone, the law undercuts "the established tradition" cited below "of severely punishing repeat offenders," (ROA.74), but in any event, the analogical mismatch is more fundamental. Again, the district court erroneously papered over the obvious distinctions between the conduct rendering Mr. Thompson subject to prosecution

under § 922(g)(1) and the actual conduct resulting in the death penalty in the Virginia Colony in 1748. "[N]ot all felons today would have been considered felons at the Founding," and the same is true for those deemed modern-day felons based on recidivist enhancements. *See Diaz*, 116 F.4th at 469.

In *United States v. Mitchell*, this Court rejected a similar attempt by the government to support § 922(g)(1) against as-applied challenge based on the mere fact of recidivism. There, the defendant was disqualified under § 922(g)(1) based on a prior conviction for "possessing a firearm as an unlawful user" of a controlled substance "in violation of § 922(g)(3)." *United States v. Mitchell*, 160 F.4th 169, 174 (5th Cir. 2025). Mr. Mitchell's conviction for violating § 922(g)(3) was his only disqualifying conviction under § 922(g)(1), but the government nevertheless asked this Court to consider his "entire criminal record" to support the analogy to historical laws aimed at recidivists. *Id.* at 190. This Court initially declined the invitation altogether but then alternatively rejected the argument on the merits. *Id.* at 191. This Court's precedent, it explained, "requires not only showing that someone convicted of *any* felony was punished in a comparable way but that someone convicted of an *analogous* felony was punished in a comparable way." *Id.* (quoting *United States v. Contreras*, 125 F.4th 725, 731 (5th Cir. 2025)). In *Mitchell*, the government cited the same 1748 law from the Virginia Colony to prove up the same tradition of harshly

punishing recidivists in the abstract. *Id.* at 190 (citing *Quiroz*, 125 F.4th at 720). This Court rejected the analogy as stretching the "analogical reasoning" inherent to any Second Amendment challenge "far beyond" the reach permitted by its precedents and those of the Supreme Court. *Id.* (quoting *United States v. Connelly*, 117 F.4th 269, 282 (5th Cir. 2024)).

This Court should reach the same conclusion here and reject the district court's death-equals-disarmament analysis. The historical analogues proffered by the government below were ultimately incorporated into the district court's order, *see* (ROA.67, 74), but whether considered individually or taken together, cannot come close to satisfying the test set forth in *Diaz*. One depends on a catch-call provision applicable to any "felony" offense not addressed elsewhere in the same statute, but the identity of those offenses remains a mystery, and both the government and district court completely failed to establish any analogical relationship between the conduct underlying Mr. Thompson's disqualifying convictions under § 922(g)(1) and the offenses that might result in the death penalty under New York's 1788 statute. As for the remaining laws, one subjected two-time burglars to death and the other targeted three-time hog thieves for the same penalty. Neither law is surprising, and even for a first-time offender, burglary was a common-law felony subject to the death penalty. ST. GEORGE TUCKER, 5 BLACKSTONE'S COMMENTARIES 228 (1803).

As for hogs, swine theft was common-law larceny, and common-law larceny was historically punishable by death. *Id.* at 235-36. Mr. Thompson is not prohibited from possessing a firearm under § 922(g)(1) based on his commission of felony theft or burglary. He is instead permanently and prospectively barred from keeping or possessing any bearable arms due to his repetition of DWI, which starts off as a Class B misdemeanor under the Texas Penal Code. The district court nevertheless credited an analogy between the laws cited below and Mr. Thompson's disqualifying convictions for DWI, but "at such a high level of generality," such reasoning will necessarily "water[] down the right[s]" protected by the Second Amendment. *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). That analysis cannot withstand this Court's *de novo* review and should be emphatically rejected.

**iii. Mr. Thompson is not, by virtue of his disqualifying convictions for felony DWI, a threat to public safety and the orderly functioning of society.**

Whether the district court accepted the government's disarm-the-dangerous argument is unclear. For its part, the government argued that Mr. Thompson's "record reveals a dangerous pattern of misusing alcohol and operating motor vehicles, often together and repeatedly against the law." (ROA.68). Those "actions pose a danger to public safety," and according to the government, "'legislatures have the power to prohibit dangerous people from possessing guns.'" (ROA.68) (quoting

*United States v. Bullock*, 124 F.4th 183, 185 (5th Cir. 2024)). The district court's order denying Mr. Thompson's as-applied challenge to § 922(g)(1) did not advance the same point but did cite an opinion from the Sixth Circuit rejecting an as-applied challenge brought by a defendant with "convictions for DUI and driving on a suspended license." (ROA.74). "[P]rior convictions for the same dangerous conduct," the Sixth Circuit concluded, "evince a likelihood of future dangerous conduct." (ROA.74) (citing *United States v. Goins*, 118 F.4th 794, 804 (6th Cir. 2024)). Whether this quotation is designed to support the district court's death-equals-disarmament analysis or to provide a stand-alone basis for rejecting Mr. Thompson's argument is unclear from the order, and the district court only spent a single sentence developing the point. (ROA.74).

In any event, the apparent analysis from the district court's order cannot withstand this Court's *de novo* review, and *United States v. Schnur* provides a helpful contrast. In *Schnur*, this Court rejected an as-applied challenge to § 922(g)(1) from a defendant with a disqualifying conviction for aggravated battery. 132 F.4th at 867-71. Mr. Schnur "was charged with this offense after he brutally attacked the victim, kicking and punching the man while he was on the ground before stealing the man's cell phone and leaving the scene." *Id.* at 868. On those facts, this Court likened the offense to the behavior prohibited by historical going-armed laws, which temporarily

disarmed and imprisoned "those who had menaced others with firearms." *See id.* at 868 (citing *Rahimi*, 602 U.S. at 697). That analogy resolved the case in the government's favor. Mr. Schnur's aggravated-battery conviction "indicate[d] that he poses a threat to public safety and the orderly functioning of society." *Id.* at 869. Since the going-armed laws established a tradition of temporarily disarming a similar group, "a ban on Schnur's ability to possess a firearm pursuant to § 922(g)(1) passes constitutional muster." *Id.* at 870.

Mr. Thompson's disqualifying conviction could not be more different. Those convictions fell within § 922(g)(1)'s criteria based on the mere fact of repetition, not any aggravating facts about his commission of the offense, and the elements of the underlying offense required only his operation of a motor vehicle while intoxicated, not real-world violence directed at others. The facts underlying his offenses were similarly uneventful. *See* Presentence Investigation Report, supra, at 10-12 (¶¶ 40-44). He did not, for example, "disregard[] a flashing red light while driving at his vehicle's maximum speed," and despite his multiple DWIs, never "cause[d] a major crash [or] serious injuries to" others. *See United States v. Betancourt*, 139 F.4th 480, 484 (5th Cir. 2025). Without such aggravating facts, Mr. Thompson's disqualifying DWI convictions are simply not analogous to the Founding Era "affray and 'going-armed'

laws" that supported this Court's decision in *Schnur*. *See id.* 484 n.6 (citing *Schnur*, 132 F.4th at 867-70).

At sentencing, the district court explicitly recognized that Mr. Thompson's criminal record was not violent. "[I]f you look at his criminal history," the district court explained, "we don't really have a history of violent criminal history, or at least violence in the sense that someone is getting beat up or using a gun." (ROA.204). "[A]s bad as a DWI is," the district court continued, "it's not quite as bad as assault, or kidnapping, or that sort of thing." (ROA.204). For its part, the government conceded that Mr. Thompson's criminal history—"simply DWIs"—did not present a single "violent" offense. (ROA.206). The district court then imposed the 60-month sentence requested by Mr. Thompson, and to support that decision, described the criminal-history category identified in the PSR as "overrepresented." (ROA.213). If the district court actually accepted the government's disarm-the-dangerous argument, these statements clearly undercut the conclusion and lend further support to Mr. Thompson's as-applied challenge.

Nor can the district court's reliance on the Sixth Circuit opinion carry the day. For one thing, the Sixth Circuit applies a distinct test from this Court's, and in *United States v. Williams*, it blessed § 922(g)(1)'s categorical ban on the possession of firearms by modern-day felons while allowing individual defendants to argue that "their

particular possession of a weapon posed no danger to peace." *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024). This Court, by contrast, correctly recognizes § 922(g)(1) as a presumptively unconstitutional infringement on the right to keep and bear arms and thus requires the government to establish in each case the statute's as-applied constitutionality. *See Schnur*, 132 F.4th at 867 (citing *Bruen*, 597 U.S. at 24). The Sixth Circuit, in turn, allows courts to consider "a defendant's entire criminal record." *Goins*, 118 F.4th at 804. This Court focuses its analysis on only those convictions falling within § 922(g)(1)'s disqualifying criteria. *See Mitchell*, 160 F.4th at 186 (quoting *United States v. Morgan*, 147 F.4th 522, 526 (5th Cir. 2025)). Last, in the Sixth Circuit, the touchstone is "dangerousness" in the abstract. *Williams*, 113 F.4th at 657. Not so here. *Mitchell*, 160 F.4th at 187 ("But Mitchell is correct on the law in this circuit: 'dangerousness' is not the governing test for disarmament under § 922(g)(1).").

Even taking the Sixth Circuit opinion on its own terms, the facts are distinguishable. In that case, one of the defendant's DWIs "resulted in a motor vehicle accident where [he] was transported to the hospital." *Goins*, 118 F.4th at 804. That fact alone distinguishes Mr. Thompson's case from the one cited below, but on top of that, the defendant in the other case was serving a term of probation at the time of the conduct underlying his § 922(g)(1) conviction, and as a result, the Sixth

Circuit determined that his temporary disarmament "as a condition of his probation, especially given his pattern of dangerous conduct," was "'consistent with this Nation's historical tradition of firearm regulation.'" *Id.* at 805 (citing *Bruen*, 597 U.S. at 17). Mr. Thompson, by contrast, discharged his most recent term of parole more than four year before committing the instant offense on October 24, 2024. *See* Presentence Investigation Report, *supra*, at 11 (¶ 44-45).

**c. The district court correctly cabined its analysis to Mr. Thompson's disqualifying convictions under § 922(g)(1), and any argument to the contrary is foreclosed.**

Credit where credit is due, the district court correctly limited its analysis to Mr. Thompson's repeat convictions for felony DWI. (ROA.74). That approach tracks this Court's approach, *see, e.g.*, *Mitchell*, 160 F.4th at 187, but the government will likely argue on appeal that other facts in the record support Mr. Thompson's disarmament. That argument is foreclosed against the government in this Circuit. *See, e.g.*, *id.* at 179 ("We are bound by the scope defined in *Diaz*."). It is also wrong. A statute's constitutionality ultimately depends upon what "it actually authorizes or prohibits." *See City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015). Section 922(g)(1) applied to Mr. Thompson based on his convictions for a series of "crime[s] punishable by imprisonment for a term exceeding one year." Given that text, this Court has appropriately cabined its Second Amendment analysis to only prior

convictions that met the statute's disqualifying criteria. *See Diaz*, 116 F.4th at 467. It should do the same in this case.

## CONCLUSION

Mr. Thompson respectfully requests this Court to vacate the judgment and reverse the conviction below.

Respectfully submitted,

/s/ Taylor Wills Edwards "T.W." Brown
**TAYLOR WILLS EDWARDS "T.W." BROWN**
ASSISTANT FEDERAL PUBLIC DEFENDER
Northern District of Texas
P.O. Box 17743
819 Taylor Street, Room 9A10
Fort Worth, TX 76102
(817) 978-2753
Taylor_W_Brown@fd.org
Texas Bar No. 24087225

## CERTIFICATE OF FILING AND SERVICE

On March 23, 2026, I filed this brief using the Court's electronic filing system. This system sent an electronic notice to opposing counsel at gsail.hayworth@usdoj.gov. I have also sent a copy of the brief via first-class mail to Alan Spencer Thompson, Reg. No. 53112-511, FMC Fort Worth, Federal Medical Center, P.O. Box 15330, Fort Worth, TX 76119. The electronic submission is an exact copy of the corresponding paper document. I have made required privacy redactions. I scanned the document for viruses and found it to be virus free.

/s/ Taylor Wills Edwards "T.W." Brown
**TAYLOR WILLS EDWARDS "T.W." BROWN**

## CERTIFICATE OF COMPLIANCE

This brief complies with all limitations found in the Federal Rules of Appellate Procedure. It contains only 6,466 words. I prepared this brief in Microsoft Word using the proportionally spaced typeface Garamond. The font is a 14-point size in the body of the text and a 12-point size in footnotes. I understand that a material misrepresentation in completing this certificate may result in the Court striking the brief and imposing sanctions.

/s/ Taylor Wills Edwards "T.W." Brown
**TAYLOR WILLS EDWARDS "T.W." BROWN**